THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL HAAS, Defendant-Appellant.

Fifth District   No. 5—88—0728

Opinion filed August 20, 1990.—Rehearing denied September 11, 1990.

Melroy B. Hutnick, of Belleville, for appellant.

John Baricevic, State's Attorney, of Belleville (Kenneth R. Boyle and Ellen Eder Irish, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE CHAPMAN delivered the opinion of the court:

The defendant, Michael Haas, was convicted of reckless homicide (count I), driving under the influence of alcohol involving great bodily harm (count II), and driving under the influence of alcohol (count III), by a jury in the circuit court of St. Clair County. Defendant was sentenced on counts I and II to concurrent terms of 30 months' probation. The court refrained from sentencing defendant on count III, on the condition that: defendant provide urine specimens once a week; that he be evaluated by Gateway Foundation and complete any and all rehabilitation, education or treatment; and that he pay a $1,000 fine plus court costs. Defendant appeals his conviction.

The accident which gave rise to defendant's conviction occurred May 17, 1987, after 1:30 a.m., on 6th Street in Mascoutah, Illinois, just south of where 6th Street intersects Fuesser Road. The speed limit on 6th Street is 55 miles per hour. It is a two-lane highway which intersects Fuesser Road at a 90-degree angle. The intersection of 6th Street and Fuesser Road is controlled only by stop signs for vehicles traveling on Fuesser Road. The area in and around the intersection is flat and without visual obstructions.

Just prior to the accident Michael Haas was driving south on 6th Street, and his friend Matthew Rasp was riding in the passenger seat. Michael Haas testified at trial that as he drove down 6th Street he passed a stopped vehicle and a police car with its red lights on, which

were on a side street. Kevin Renth was the driver of the stopped vehicle. As Haas drove past, Renth pulled out behind him. Haas testified that as he approached Fuesser Road, he was traveling 35 miles per hour and was approximately 100 feet from the intersection when he entered the oncoming lane of traffic. He drove into the oncoming lane because he intended to make a left turn onto Fuesser Road. He did not see any oncoming vehicles or any headlights. Haas observed the vehicle behind him begin to pass him on the right. Haas was in the oncoming lane of traffic for one or two seconds when the impact occurred between his vehicle and a police patrol vehicle driven by Officer Brett Warner.

Officer Warner, a patrolman with the Mascoutah police department, was traveling northbound on 6th Street immediately prior to the accident. He was traveling 50 miles per hour. Warner testified that, as he approached the Fuesser Road intersection, he observed southbound traffic in the southbound lane coming towards him. He testified that when he was approximately 100 feet from the intersection he noticed the vehicle in the southbound lane pull into his lane as if it wanted to make a turn onto Fuesser Road. Warner stated that when he saw the vehicle come into his lane he immediately turned to the right and applied his brakes. When Warner started leaving the roadway to the right, the impact occurred. He did not recall much of what happened after the accident.

Matthew Rasp was killed in the accident. After the accident Michael Haas was transported to the hospital and submitted to a blood test for the purpose of obtaining his blood-alcohol content. The results of the tests on the blood samples were admitted at trial over defendant's objection. Defendant contends that he was not given *Miranda* warnings (see *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602) and that he did not authorize the withdrawal of his blood for the purpose of testing. Defendant argues that even if he were given *Miranda* warnings and otherwise advised of his rights, he was in no condition to understand those rights or to intelligently waive them. Defendant contends that the trial court erred in ruling that he knowingly and intelligently waived his rights against self-incrimination and voluntarily authorized the withdrawal of his blood. Defendant refers us to the testimony elicited at trial by witnesses who described his condition after the accident.

Kevin Renth identified himself as the person who was driving the car that Michael Haas testified had pulled out behind him on 6th Street prior to the collision. Renth testified that after the collision, he stopped his car and ran over to Haas' truck. He testified, "the truck

had turned over and he was like sitting up *** I think he was knocked out *** he crawled through the window *** there was somebody underneath him." Renth continued, "he wasn't hysterical *** he was just walking around and, you know, saying I can't believe this happened. I wouldn't say he was hysterical *** considering what happened, he was in pretty good shape."

Joseph Beil, the second person to arrive at the accident scene, testified that "the truck was on its side, kind of like sitting kind of straight up, like if there had been a chair sideways before the truck turned over, he was sitting upright." Beil described Haas after he got out of the truck as "real hysterical and everything *** scared and panicky *** not in a calm state of mind *** he was crying."

Jeffrey Wombacher, another witness at the scene, testified that he went to the hospital where Michael Haas was transported. Wombacher testified that "he was shaken up pretty bad, had cuts and everything from the wreck *** he was just all excited and he was trying to calm down."

Michael Haas testified that he does not recall Kevin Renth being at the scene of the accident. Haas remembered the police at the scene asking him what had happened, but did not remember what answers he gave. Haas also could not recall whether he was given any admonitions against self-incrimination. He testified, however, that he remembered the police transporting him to the hospital, and remembered that he was able to provide the hospital admissions personnel with the information they needed. Although he recalled signing a form and the nurse taking his blood in the examining room, he did not recollect anyone explaining to him the rights of motorists with regard to giving blood.

Robert Brandkamp, a deputy with the St. Clair County sheriff's department, testified that he arrived at the accident scene shortly after the collision. Brandkamp testified that at the time that he spoke with the defendant, Haas was crying and upset, and when he asked Haas what had happened, Haas stated that they had been to the Mayfest and were on their way back to Mascoutah. Brandkamp testified that he ceased questioning Haas when he noticed that Haas had the odor of an alcoholic beverage on his breath. Brandkamp testified that he asked the defendant if he would be willing to submit to a blood-alcohol test, and that the defendant responded that he would. Haas was then transported to the hospital by Deputy Klucker.

Keith Klucker, the St. Clair County sheriff's deputy who transported Haas to the hospital, testified that after the accident and at approximately 2:35 a.m., he read defendant his *Miranda* rights and

warning to motorists. Deputy Klucker stated that after he read defendant his rights, the defendant advised him that he was aware of them and that he understood his rights. Although Klucker did not have the defendant sign the warning to motorists form, Klucker testified that the defendant did sign the hospital form authorizing hospital personnel to draw a blood sample to determine its alcohol content.

■ Section 11—501.1(c) of the Illinois Vehicle Code requires that a person requested to submit to a blood test be warned by the law enforcement officer requesting the test that a refusal to submit to the test will result in the statutory summary suspension of such person's driving privileges. (Ill. Rev. Stat. 1989, ch. 95½, par. 11—501.1(c).) A written warning is not required. *In re Summary Suspension of Drivers License of Rakers* (1989), 187 Ill. App. 3d 27, 32, 542 N.E.2d 1311, 1314.

■ The trial court found that, while defendant was obviously upset about the accident, he was oriented as to time, place, and circumstances, and was aware of what he was involved in and of what was happening to him as the evening progressed. The court found that the officer advised Haas of his rights and that Haas indicated that he understood those rights. When the evidence is contradictory, it is for the trial court to resolve all conflicts and determine the credibility of the witnesses. We will not disturb the trial court's findings unless they are against the manifest weight of the evidence. (*Orchard Shopping Center, Inc. v. Campo* (1985), 138 Ill. App. 3d 656, 665, 485 N.E.2d 1248, 1254.) We find that the trial court's denial of defendant's motions to suppress was not against the manifest weight of the evidence.

We also find that defendant's argument that the court erred in not suppressing the blood-alcohol test results because he was not given *Miranda* warnings to be without merit. *Miranda* warnings are applicable only to testimonial evidence. (*Miranda*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) Blood tests are noncommunicative in nature (*Schmerber v. California* (1966), 384 U.S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826) and, as such, may be conducted without the procedural protections encompassed by the *Miranda* warnings. See *Village of Algonquin v. Ford* (1986), 145 Ill. App. 3d 19, 495 N.E.2d 595.

Defendant next argues that the trial court erred in admitting the results of the tests on the blood samples into evidence because there was no proof that a preservative or anticoagulant was used. Defendant directs our attention to the following testimony of Ramona Carpenter, the phlebotomist who drew defendant's blood samples:

"Q. So you have no idea, you don't do any testing on those

particular tubes to make sure that they are in good working order before you use them, do you?

A. No.

Q. You merely take the tubes, take the blood, inject the blood into the tubes, put them into the container and whatever happens to it next.

A. That's right.

Q. So as you sit here today testifying, I know honestly and candidly, you can't say to the ladies and gentlemen of the jury that there, in fact, was that potassium and that ox stuff in those tubes?

A. That I couldn't say.

Q. Yes, ma'am.

A. Before the blood is in the tube, it's a powder form like be in the bottom of the tube.

Q. You don't know how long that had been there?

A. No.

Q. You don't know if, what was in there was what it was supposed to be, do you?

A. No.

Q. Because you didn't put it in there.

A. That's true.

Q. No one in your presence put it in there?

A. No.

Q. Thank you. And it came from the manufacturer someplace else?

A. Yes."

Defendant does not question the testing procedure performed by Carpenter. Defendant argues, however, that there is no way of knowing what in fact was in the vials at the time they were used, and there is no way of knowing what quality control measures the manufacturer used to insure the integrity of the vials and what they were supposed to contain prior to use.

■■ There is no question that in order for the test results to be considered valid and admissible as evidence, the testing procedures must comply with the Department of Public Health standards. (See Ill. Rev. Stat. 1989, ch. 95½, par. 11—501.2(a).) One of the standards promulgated pursuant to section 11—501.2(a) requires that "[w]hen vacuum-type blood-collecting containers are *** used as primary collecting tubes, two (2) tubes should be collected *each containing an anticoagulant/preservative* which will not interfere with the intended analytical method." (Emphasis added.) Illinois Department of Public

Health, Standards and Procedures for Testing for Alcohol and/or Other Drugs §510.110(a)(4)(C) (1982).

Ramona Carpenter testified that she injected the blood taken from defendant into the tubes provided in a testing kit, which the hospital made available to her for that purpose. She testified that to her knowledge, the tubes are prepared by a manufacturer and shipped to the hospital. Carpenter testified that the tubes she used in taking defendant's blood sample were sealed; she did not remove the seal, but merely punctured the seal with the needle, and injected the blood into the vial. Carpenter testified that the tubes contained a powdered substance, which she presumed was the preservatives potassium oxalate and sodium chloride.

Marian Papiernik, a forensic scientist with the Illinois State Police Bureau of Forensic Science, testified that upon receipt of the vials of blood for testing, she noted that the seals were intact. At the time of testing the blood, Papiernik checked the color, the odor, and the consistency of the blood in the vial. She testified that there appeared to be nothing wrong with the blood. Papiernik explained that had she detected an odor, an off-color, or clotting in the blood, it would have indicated to her that there might not have been a preservative or anticoagulant present.

▉ Based on the testimony, and in the absence of any evidence that the procedure followed was either contrary to the manufacturer's recommendations or not approved by the Department of Public Health, we do not believe that it was necessary for the State to prove what quality control measures the manufacturer used to insure the integrity of the vials, or what definitive substance was in the vials at the time blood was drawn. (*People v. Clark* (1989), 178 Ill. App. 3d 848, 854, 533 N.E.2d 974, 978.) We find that the trial court properly determined that results of the test performed on the blood samples were admissible into evidence.

▉ ▉ Defendant next contends that the trial court erred in admitting the test results into evidence because a chain of custody was not established. The rule is well settled that the State has the burden of proving a continuous chain of possession in order to establish a foundation. (*People v. Cain* (1966), 35 Ill. 2d 184, 188, 220 N.E.2d 195, 198, *cert. denied* (1967), 385 U.S. 1042, 17 L. Ed. 2d 686, 87 S. Ct. 781.) To determine whether the trial court abused its discretion, we will examine the evidentiary foundation presented by the State.

The record indicates that Deputy Klucker was present when defendant's blood was drawn. After taking the blood, the phlebotomist handed the sealed vials to the deputy, who at that time labeled

each vial with his signature. Deputy Klucker placed the vials in a container and gave them to Deputy Brandkamp. Klucker identified the tubes and container at trial as the ones used to obtain blood samples from the defendant. After receiving the container, Brandkamp transported it to the sheriff's department, where he placed it in the evidence refrigerator. Brandkamp testified that when he received the container and while it was in his possession it was sealed. Brandkamp identified the container at trial as the same one given to him by Deputy Klucker.

Two days later Daniel Jennings, the crime scene investigator for the sheriff's department, removed the blood sample container from the refrigerator. Although there is no lock on the evidence refrigerator, Jennings testified that it is located by his office, which is separate from the investigating unit. Jennings did not open the sealed package. Jennings initialed the package, wrapped it in brown paper and mailed it by certified mail to the forensic laboratory for testing. He received the container back from the laboratory 10 days after he forwarded it there.

Marian Papiernik, the forensic scientist who tested the blood samples, testified that she received the package containing the samples via registered mail from the St. Clair County sheriff's department the day after Jennings mailed it. Upon receipt of the package, the container and the vials of blood were sealed. Papiernik labeled the vials and then placed them in the refrigerated vault which is accessible only to the analytical personnel with whom she works. Two days later when she removed a vial for testing, the seal on it was intact. Papiernik identified the vials of blood at trial as the same ones she received and labeled.

Defendant objected to the admission of the blood samples into evidence because the vials show the initials of a number of people and not all of those persons who initialed the vials testified. In addition, not all of their names had been disclosed to the defendant. We find that a rule requiring that there be positive identification by everyone concerned would impose an unnecessary burden, while it would not assure a fair trial to the accused. *People v. Cain*, 35 Ill. 2d at 188, 220 N.E.2d at 198.

Defendant also complains that admission of the blood samples into evidence was error because the record shows that, upon delivery to Brandkamp, the vials were placed in an unsecured refrigerator accessible to virtually anyone. In proving chain of custody, the State is required to demonstrate a reasonable probability that the evidence has not been changed in any important respect. (*People v. Valentin* (1978),

66 Ill. App. 3d 488, 492, 384 N.E.2d 67, 69.) Since there is no evidence of tampering, alteration or substitution in the record (*People v. Richards* (1970), 120 Ill. App. 2d 313, 340, 256 N.E.2d 475, 489-90), we find that the chain of custody was sufficiently proved to entitle the vials to be admitted into evidence.

Defendant contends that even if we find that the chain of custody was sufficiently established, admission of the blood samples into evidence violated his due process rights. Defendant argues that the undisputed testimony of Marian Papiernik establishes that her findings with regard to the blood analysis were not verified by anyone. Defendant argues that a single unverified blood test is insufficient to convict and constitutes a violation of due process of law.

Contrary to defendant's assertion that his conviction was based solely on a single unverified blood test, there is additional evidence in the record, as illustrated in the witnesses' testimony set forth in this opinion, which supports the jury's finding of guilt. Furthermore, we find that defendant was not denied due process by virtue of the blood-testing procedure conducted in this case. Defendant relies on *Jones v. McKenzie* (D.C. Cir. 1986), 628 F. Supp. 1500, *rev'd on other grounds* (1987), 833 F.2d 335, and *Capua v. City of Plainfield* (D.N.J. 1986), 643 F. Supp. 1507.

In *Jones*, the plaintiff, an employee of the school district, was discharged when she tested positive after a urinalysis. Plaintiff's employment was governed by board of education rules which permited discharge of an employee in plaintiff's position only for *cause*. Without confirming whether plaintiff's termination violated substantive due process, the court found that the board of education rules permitting dismissal only for *cause*, and the urine test manufacturer's warning that positive results of the urinalysis should be confirmed by an alternate method, were sufficient to demonstrate that plaintiff's termination was arbitrary and capricious. The *Jones* court further commented that "confirmation" of the test results, as that term is used in the school district directives and the manufacturer's warning, contemplated an alternative testing method such as the two suggested by the manufacturer.

Unlike *Jones*, there is no evidence that alternative testing methods are recommended to assure the accuracy of blood tests such as those which were performed in the instant case. Furthermore, there was additional evidence supporting the accuracy of the blood-test results. In performing the analysis, Marian Papiernik testified that she took two samples of defendant's blood and ran duplicate tests on each. The samples were analyzed using a head-space gas chromatogra-

phy. Papiernik testified that routine checks are conducted on the instruments used by the laboratory to test the accuracy of the instruments. On the same day defendant's blood was analyzed, Papiernik ran a series of controls to test the accuracy of the head-space gas chromatography, and the controls were within acceptable ranges.

In *Capua v. City of Plainfield*, 16 firefighting personnel were terminated from employment after they tested positive in urinalysis tests conducted on 103 employees of the Plainfield fire department. The plaintiffs were not informed of the substance found in their urine, nor were they provided copies of the laboratory results. The court held that defendant's refusal to afford plaintiffs a full opportunity to evaluate and review their personal test results or to have their own specimens retested by a technician of their choice offended traditional notions of fundamental fairness and due process. In the case at bar, the element of surprise was nonexistent as defendant was advised of his right to forego the blood test. Likewise, there is no evidence that defendant was denied the opportunity to review his test results, or to have an independent blood test conducted.

■ It is apparent from the record that the blood-testing procedure performed on defendant's blood sample was more than a single unverified test. In addition, defendant's conviction was based on more than the results of the blood test, as there was independent evidence of intoxication presented. We conclude that defendant was not denied due process.

The next issue raised by defendant is whether the court erred in denying defendant's motion for mistrial made during the State's closing argument, when the prosecutor stated:

> "Now, what about this blood test? Was there any evidence, and if there was any evidence of tampering in this case, do you think this evidence would be before you today? Would the State bring this case if there was evidence of tampering? You'll notice in here, and it's interesting, he talks about only one sample, only one test. What about the quality assurance, what about the credibility of that test? You'll notice there's two vials of blood in here. And you'll remember the testimony of Marian Papiernik, that she only tested blood from the vial marked 1-A. What's this other vial for? There was another vial of blood there. Mr. Hutnik had the opportunity if he wanted to test this blood. If he doubted the credibility of this—."

At this point in the argument defendant moved for a mistrial. The court denied defendant's motion, instructed the assistant State's Attorney not to comment further on the matter, and the jury was di-

rected to disregard the last comment made by the assistant State's Attorney.

Defendant argues that the trial court erred in not granting a mistrial at this juncture because the prosecution mistated the burden of proof and led the jury to believe that defendant had the burden of proving his innocence. The State contends that the assistant State's Attorney's comments were made in response to defense counsel's closing argument. In particular, reference is made to the following comment, taken from defense counsel's closing argument:

"What also scares me a little about that, he's put his entire case on one test, by one person in Springfield, Illinois, with no verification. And he says to you that alone ought to be enough to convict Michael Haas of everything here. And that scares me. To say that that person couldn't make a mistake there had to be some way to verify, run a second test. The State of Illinois has got the money, don't worry about them running short on funds. Run a second test, do something to verify it, overcome the fact the margin of error that people can make. Nothing to verify it. There is no second opinion if you will, no verification, just that one test quickly run that says he's guilty."

■■ While a defendant cannot claim error where the prosecutor's remarks have been invited and provoked by defense counsel (*People v. Suane* (1987), 164 Ill. App. 3d 997, 1004, 518 N.E.2d 458, 463; *People v. Dixon* (1982), 91 Ill. 2d 346, 350-51, 438 N.E.2d 180, 183), we do not believe the remarks made by defense counsel warranted the improper rebuttal by the prosecution. Argument as to the testing procedure performed by Marian Papiernik, and comments as to the reliability of the testing procedures as demonstrated by the evidence, would have been sufficient to rebut defense counsel's argument. Nonetheless, a mistrial should be declared only in cases where there is an occurrence of such magnitude as to deprive a party of a fair trial. *People v. Suane,* 164 Ill. App. 3d at 1006, 518 N.E.2d at 464; see also *People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200.

■■ Contrary to the defendant's argument that but for the State's improper closing remarks the jury would not have rendered a guilty verdict, there was not only evidence of the blood-test results, but also evidence that defendant had been drinking and that he was intoxicated at the scene. Proof of the reliability of the blood-testing procedures was also presented. In view of the whole record, and the trial court's promptly sustaining defendant's objection to the prosecution's remarks and instructing the jury to disregard such argument, we find no error in the trial court's denial of the motion for a mistrial.

Defendant next contests the constitutionality of sections 11—501.2(b)(3) and 11—501(d)(3) of the Illinois Vehicle Code (Ill. Rev. Stat. 1989, ch. 95½, pars. 11—501.2(b)(3), 11—501(d)(3)), and section 9—3(c)(1) of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 9—3(c)(1)). The common element each of these three sections possesses, upon which defendant's argument is based, pertains to the presumption that a person is under the influence of alcohol if his blood-alcohol concentration is 0.10 or more. Defendant argues that this legislatively created presumption deprives a defendant of his constitutional right to a trial by jury (Ill. Const. 1970, art. I, §13), and also unconstitutionally shifts the burden to a defendant to prove his innocence.

■■ In response, the prosecution maintains that defendant waived this issue on appeal because he failed to raise the objection at trial or in his post-trial motion. After reviewing the record we find that defendant did object at the jury instruction conference to the giving of the jury instruction taken from Illinois Pattern Jury Instructions, Criminal, No. 23.06 (2d ed. 1981) (hereinafter IPI Criminal 2d No. 23.06). Defendant's post-trial motion also included a claim that the trial court erred in giving each instruction objected to by defendant. We note, however, that while defendant objected to the instruction during the conference, he did not raise the specific objection which he now asserts on appeal, and he did not tender an instruction setting forth his interpretation of the law. It is defendant's duty to tender at trial a proper instruction on a particular issue, and failure to do so will preclude him from raising objections to the given instruction on appeal. (*People v. Smith* (1978), 71 Ill. 2d 95, 104, 374 N.E.2d 472, 475.) However, if the interests of justice require, substantial defects in jury instructions in criminal cases are not waived by failing to object properly. 107 Ill. 2d R. 451(c); *People v. Reding* (1989), 191 Ill. App. 3d 424, 446, 547 N.E.2d 1310, 1324.

The prosecution also points out that defendant has failed to cite any authority in support of his argument that giving IPI Criminal 2d No. 23.06 was error. The rule of waiver is a limitation on the parties and not on the courts, and a reviewing court may ignore the waiver rule in order to achieve a just result. (*People v. Hoskins* (1984), 101 Ill. 2d 209, 219, 461 N.E.2d 941, 946.) We, therefore, will address the merits of the issue raised by defendant.

■■ ■ The Illinois Supreme Court has recognized that the evidentiary devices known as presumptions are categorized into two groups: mandatory and permissive. (*People v. Hester* (1989), 131 Ill. 2d 91, 99, 544 N.E.2d 797, 801.) A mandatory presumption is one

where the fact finder is not free to reject the presumption. The trier of fact must find the presumed elemental fact upon proof of the basic fact, at least unless the defendant has come forward with some evidence to rebut the presumed connection between the two facts. (*County Court v. Allen* (1979), 442 U.S. 140, 157, 60 L. Ed. 2d 777, 792, 99 S. Ct. 2213, 2225.) A permissive presumption leaves the trier of fact free to credit or reject the connection between the presumed fact and the basic fact. (*County Court*, 442 U.S. at 157, 60 L. Ed. 2d at 792, 99 S. Ct. at 2225.) In criminal cases the ultimate test of any device's constitutional validity remains constant: the device must not undermine the fact finder's responsibility at trial, based on evidence adduced by the State, to find the ultimate facts beyond a reasonable doubt. (*County Court*, 442 U.S. at 156, 60 L. Ed. 2d at 791, 99 S. Ct. at 2224.) In *Hester* (131 Ill. 2d at 100, 544 N.E.2d at 802), the court held that to determine whether a presumption contained in a jury instruction is mandatory or permissive, a court must examine the words contained in the jury instruction.

In the instant case, the questioned jury instruction given was as follows:

"If you find that the amount of alcohol in the defendant's blood as shown by a chemical analysis of his blood was .10 percent or more by weight of alcohol, you shall presume that the defendant was under the influence of intoxicating liquor.

However, this presumption is not binding on you and you may take into consideration any other evidence in determining whether or not the defendant was under the influence of intoxicating liquor." (Illinois Pattern Jury Instructions, Criminal, No. 23.06 (2d ed. 1981).)

In *Hester* the court stated that the fourth district cases of *People v. Elliott* (1986), 143 Ill. App. 3d 72, 492 N.E.2d 946, *People v. Frazier* (1984), 123 Ill. App. 3d 563, 463 N.E.2d 165, and *People v. Malik* (1983), 113 Ill. App. 3d 206, 446 N.E.2d 931, indicate that IPI Criminal 2d No. 23.06 does not fairly state the law, because the first paragraph of the instruction includes language which appears to denote a mandatory presumption, while the second paragraph contains permissive language. The supreme court, however, did not conclusively find that the giving of IPI Criminal 2d No. 23.06 without modification would constitute grave error.

We note that subsequent to trial IPI Criminal 2d No. 23.06 was modified, deleting the mandatory language of paragraph one, and adding language clarifying the jury's role to consider all of the evidence in determining whether the defendant was under the influence

of alcohol. (See Illinois Pattern Jury Instructions, Criminal, No. 23.06 (2d ed. Supp. 1981).) While we agree that this modified version of IPI Criminal 2d No. 23.06 is preferable, we will now address whether it was error for the trial court here to give the nonmodified version of the instruction.

In *People v. Frazier*, IPI Criminal 2d No. 23.06 was given. The court found that since the instruction used the words "you *shall* presume," it created an impermissible presumption. The court held, however, that the error created by the first paragraph was cured by the jury instructions read as a whole, because the language of the second paragraph permitted the jury to disregard the presumption. (*Frazier*, 123 Ill. App. 3d at 573, 463 N.E.2d at 173.) As in *Frazier*, the court in the case at bar instructed the jurors as to the presumption of innocence and that it was within their province to decide questions of fact. Each of the instructions on reckless homicide, driving under the influence of intoxicating liquor, and driving under the influence of intoxicating liquor involving great bodily harm required the jury to determine that all of the propositions were proven beyond a reasonable doubt. Jury instructions must be construed as a whole and not viewed in isolation. (*People v. Housby* (1981), 84 Ill. 2d 415, 433-34, 420 N.E.2d 151, 160; *People v. Reding* (1989), 191 Ill. App. 3d 424, 448, 547 N.E.2d 1310, 1326.) In this case the instructions as a whole informed the jury that it was not bound by any presumptions, nor did they shift the burden of proof to the defendant. (*Reding*, 191 Ill. App. 3d 424, 448, 547 N.E.2d 1310, 1326.) We find, therefore, that defendant was not deprived of his constitutional right to trial by jury, nor was he shouldered with the burden of proving his innocence.

Defendant also contends that two of the jury instructions given did not accurately state the law. Both instructions were non-Illinois Pattern Jury Instructions.

The first instruction, which was based upon sections 9—3(b) and 9—3(c) of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, pars. 9—3(b), (c)), read:

> "Being under the influence of alcohol at the time of the alleged violation shall be prima facie evidence of a reckless act. A person shall be considered to be under the influence of alcohol if the alcohol concentration of such persons blood is .10 percent or more by weight of alcohol."

Defendant claims that this instruction made it appear that there was but a single definition of being under the influence which applied to each of the charges in this case. Defendant also claims that the in-

struction's omission of the language of section 9—3(c) that, "the alcohol concentration in such person's blood or breath is 0.10 or more based on the definition of blood and breath units in Section 11—501.2 of the Illinois Vehicle Code," misrepresented the law.

■■ ■ The test of the correctness or propriety of instructions is not what meaning the ingenuity of counsel can attribute to them, but how and in what sense, under the evidence before them and considering the circumstances of the trial, ordinary men acting as jurors will understand the instructions. (*Mudd v. Goldblatt Brothers, Inc.* (1983), 118 Ill. App. 3d 431, 439, 454 N.E.2d 754, 760.) Defendant's argument that the instruction made it appear that there was but one definition of being under the influence which applied to every charge in this case is without merit. The instruction itself refers to a *"reckless act,"* thus denoting its applicability to the reckless homicide charge. Furthermore, the other instructions given to the jury clearly indicate that the definition of "being under the influence" in the instruction did not apply to the other charges against defendant. The charge of driving under the influence of intoxicating liquor included its own distinct definition of when a person is considered to be under the influence of intoxicating liquor:

> "When as a result of drinking any amount of intoxicating liquor his mental and/or physical faculties are so impaired as to reduce his ability to think and act with ordinary care."

Furthermore, IPI Criminal 2d No. 23.06 was given and explained the standard for determining whether defendant was under the influence of intoxicating liquor so as to sustain the charges of driving under the influence of intoxicating liquor. Jury instructions are to be construed as a whole and not taken in isolation. (*People v. Housby* (1981), 84 Ill. 2d 415, 433-34, 420 N.E.2d 151, 160.) It is clear that the instruction did not lead the jury to conclude that it was bound to the definition of "being under the influence" as to every charge.

Defendant's claim that the instruction's omission of language taken from section 9—3(c) mistated the law is also unfounded. The decision whether to give a non-IPI instruction rests within the sound discretion of the trial court. (107 Ill. 2d R. 451(a); *People v. Stamps* (1982), 108 Ill. App. 3d 280, 298, 438 N.E.2d 1282, 1297.) The language of the given instruction was taken from the language of section 9—3. The omitted language of which defendant complains would not have added anything of which the jury was not already apprised. We do not find that the court abused its discretion in giving the instruction.

■■ The second jury instruction which defendant contends the court erred in giving read:

"A person commits the offense of Driving Under the Influence of Intoxicating Liquor Involving Great Bodily Harm when he drives any vehicle while under the influence of intoxicating liquor and was involved in a motor vehicle accident which resulted in great bodily harm to another when such violation was the proximate cause of such injuries."

Defendant argues that this instruction is cumulative and fails to provide a definition of driving under the influence. As stated in our discussion of the preceding issue, the jury was apprised via other jury instructions of the definition of "driving under the influence." As jury instructions must be construed as a whole, we find that any alleged error was cured by the other instructions.

Defendant contends that the instruction at issue was cumulative in light of the following instruction which was given:

"To sustain the charge of Driving Under the Influence of Intoxicating Liquor Involving Great Bodily Harm, the State must prove the following propositions:

FIRST: That the defendant drove a vehicle; and

SECOND: That the defendant then was under the influence of intoxicating liquor.

THIRD: The defendant was involved in a motor vehicle accident which resulted in great bodily harm to Brett Warner['s] injuries.

If you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

While the giving of repetitious jury instructions is not favored, we do not believe that there was prejudicial error committed in giving both of the instructions. Considering the instructions as a whole, we do not find that the jury was misled or that defendant's rights were prejudiced. *Sphatt v. Tulley* (1962), 38 Ill. App. 2d 229, 236, 186 N.E.2d 670, 673.

Defendant's final issue on appeal is whether the trial court erred in denying defendant the right to present a videotaped enactment of the course Officer Warner's vehicle traveled prior to the accident. *Voir dire* of defendant's witness who produced the videotape enactment was conducted outside the presence of the jury. Defendant's witness, Anthony Golec, testified that he prepared the videotape enactment for the purpose of demonstrating the braking action and

stopping distance of a vehicle in an emergency situation. Defendant contends that the videotape clearly shows that Officer Warner would have had no difficulty in stopping his vehicle and avoiding the accident if the accident occurred as Officer Warner testified.

The determination of whether to admit or exclude evidence of experiments rests largely in the sound discretion of the trial judge, and his decision will not be overturned on appeal absent a clear showing of abuse of discretion. (*Rockett v. Chevrolet Motor Division, General Motors Corp.* (1975), 31 Ill. App. 3d 217, 225, 334 N.E.2d 764, 771.) Reconstruction experiments are incompetent unless the essential elements of the experiment are shown to be substantially similar to those existing at the time of the accident. (*Hubbard v. McDonough Power Equipment, Inc.* (1980), 83 Ill. App. 3d 272, 280, 404 N.E.2d 311, 318.) In this case there were several material differences between the conditions portrayed via the videotape and the actual accident.

The investigator who produced the videotape enactment testified that he performed no tests to determine if the braking mechanism on the test car differed from the car driven by the officer. The car used in the test was a 4,242-pound 1986 Oldsmobile 98, while the car driven by Officer Warner was a 3,820-pound Ford Crown Victoria. No tests were conducted to determine whether the road surface at the time of the test was the same as it was at the time of the accident. The test was conducted between 8 a.m. and 9:30 a.m., while the accident occurred in the dark early morning hours. Based on these dissimilarities, we cannot find that the trial court abused its discretion in refusing admission of the evidence.

Based on the foregoing, we affirm the decision of the trial court of St. Clair County.

Affirmed.

WELCH and RARICK, JJ., concur.